REVISED JANUARY 27, 2003
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-51113
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOHN T HEFFERON

Defendant-Appellant

_____

Appeal from the United States District Court
for the Western District of Texas
_____

December 9, 2002

Before KING, Chief Judge, and JONES and EMILIO M. GARZA, Circuit Judges.

KING, Chief Judge:

Defendant John T. Hefferon ("Hefferon") appeals from a jury conviction for knowingly engaging in a sexual act with a victim under the age of twelve in violation of 18 U.S.C. § 2241. Upon consideration, we affirm.

**STATEMENT OF THE CASE**

In January 2001, the seven-year-old victim, Alejandra, was residing with her family at Lackland Air Force Base's temporary lodging facility in San Antonio. The family was awaiting a move to

1

Germany in connection with their father's position as a Captain in the Air Force. On January 1, 2001, at approximately 11:00 p.m., Alejandra's parents left her and her eleven-year-old sister, Arlene, in the care of their thirteen-year-old brother, Orlando.[1] Alejandra and Arlene went with Orlando to the laundry room, which was located near their own room on the facility. Although she initially followed her brother to the laundry room, Alejandra then started back to the family's room (room 105) by herself. She testified that at this time "Big John" spotted her. All three children testified that "Big John" was the name they used to refer to the man in room 205. Hefferon, a retired Navy officer, was staying at the temporary lodging facility in room 205 with his wife and son.

"Big John" tricked Alejandra into going with him by the trees near the playground by asking her to find a place to go "pottie." Once there, "Big John" told Alejandra to "squeez[e] [his] private," which she did. After Alejandra told him that Arlene and Orlando were approaching, "Big John" then tricked Alejandra into selecting a new place for him to go to the bathroom. She suggested that he go by some garbage dumpsters located on the facility property. Once in this area, "Big John" again told Alejandra to squeeze his penis, but not so hard; she complied with his demand. He

---

[1] The parents were apparently taking Alejandra's younger sister to a friend's house to be blessed. She had been recently hospitalized for a hurt leg.

2

thereafter told her to place his penis in her mouth.  She again complied.  "Big John" then moved her head back and forth, telling her that it was getting bigger.  Before he let her go, "Big John" told Alejandra this was their "little secret."

Arlene, who had been searching for her sister, saw Alejandra with "Big John" and heard "Big John" tell her, "[r]emember, Alejandra, it is our little secret."  "Big John" then told Arlene that he had found Alejandra hiding from her.

Once in the family's room, Alejandra began spitting in a trash can.  She refused to explain what was wrong with her, stating only that it was "too gross" and that she could not reveal where she had been because it was "her little secret."  She finally agreed to discuss the encounter with her siblings if they went to a place where "he" could not hear them since he was right above her.  It is undisputed that room 205 is located directly above her family's room, room 105.  Once in the family's restroom, Alejandra told her siblings about the encounter.

Orlando called his parents.  Because Alejandra was too upset to talk to her parents, Orlando gave his father the details of the encounter as recently told to him by Alejandra.  Alejandra's father immediately called the military police.

After speaking to Alejandra and her mother, the military police officers confronted Hefferon, who was found walking briskly from his room (at approximately midnight) toward his car, which was parked in the slot closest to the stairs leading down from his

3

room. The trunk of the car was open and Hefferon was carrying suitcases when found by the officers. The officers detained Hefferon. Shortly thereafter, Alejandra positively identified Hefferon as her assailant at a show-up conducted at the temporary lodging facility.

On October 18, 2000, a jury found Hefferon guilty of knowingly engaging in a sexual act with a victim under the age of twelve in violation of 18 U.S.C. § 2241. At sentencing the district court departed upward on several grounds: (1) Hefferon's criminal history does not adequately represent his prior criminal conduct (increase of Hefferon's criminal history score from a I to a IV); (2) the victim suffers from an extreme psychological injury (upward departure of three levels); and (3) Hefferon's offense involved multiple acts of criminal sexual abuse of the same victim (upward departure of two levels). The district court further found that Hefferon had "abducted" his victim within the meaning of the Sentencing Guidelines and adjusted his base level upward four levels. Hefferon's offense level of forty and his Criminal History Category of IV resulted in a Guideline imprisonment range of 360 months to life. The district court sentenced him to a 420-month imprisonment term, followed by a five-year term of supervised release. No fine was assessed.

Hefferon raises several arguments on appeal related to the alleged insufficiency of the government's evidence to prove that he was Alejandra's assailant. Hefferon also appeals the district

4

court's upward adjustment for abduction and the district court's upward departure for inadequacy of criminal history, extreme psychological injury of the victim and multiple assaults of the victim.

**ANALYSIS**

## I.    Evidence of Identity

Hefferon avers that the out-of-court identification of him by Alejandra (and the in-court use thereof), the in-court identification of him by Orlando, and the out-of-court statements by Alejandra and her siblings admitted into evidence constitute reversible error.   Hefferon also generally maintains that the evidence introduced at trial was insufficient to prove his identity as the assailant beyond a reasonable doubt.   Each point is addressed below.

### A.    The One-On-One Show-Up

Prior to trial, Hefferon moved to suppress any in-court identification of him by Alejandra because she identified him as her assailant at a show-up alleged to be impermissibly suggestive. The district court denied the motion.   Hefferon appeals this denial.

When reviewing a trial court's ruling on a motion to suppress, this court accepts the trial court's purely factual findings unless clearly erroneous or influenced by an incorrect view of the law. United States v. Maldonado, 735 F.2d 809, 814 (5th Cir. 1984).

5

Whether identification is constitutionally admissible is a mixed question of fact and law. Peters v. Whitley, 942 F.2d 937, 939 (5th Cir. 1991).

A show-up differs from a line-up in several key respects. Rather than having a group of individuals generally fitting the victim's description of the assailant line up together for identification purposes, a single individual fitting the description is presented to the victim for identification. In Neil v. Biggers, 409 U.S. 188, 193 (1972), the Supreme Court rejected a per se approach to whether a suggestive show-up automatically violates a defendant's due process rights, holding instead that suggestive identification procedures do not violate due process if, on balance, the relative reliability of the show-up guards against the likelihood of misidentification. Id. at 199. In so doing, it counsels us to employ a "totality of the circumstances" test to determine if an identification procedure is violative of the Due Process Clause of the Fifth Amendment. To apply this test, the court is to consider the following factors: the opportunity of the witness to view the assailant at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the assailant, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Id.

The facts of the Neil case are instructive. There, the alleged assailant defendant was identified by the rape victim in a

6

one-on-one show-up at the stationhouse seven months after her encounter.  Id.  Following a hearing, the district court held that the stationhouse identification procedure was so suggestive that it violated the defendant's due process rights.  Id.  The court of appeals affirmed.  Reversing, the Supreme Court held that:

> [T]he District Court's conclusions on the critical facts are unsupported by the record and clearly erroneous.  The victim spent a considerable period of time with her assailant, up to half an hour.  She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately.  She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes . . . She had "no doubt" that respondent was the person who raped her.
> . . .
> There was, to be sure, a lapse of seven months between the rape and the confrontation.  This would be a seriously negative factor in most cases.  Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings.  Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup.

Weighing all the factors, we find no substantial likelihood of misidentification. The evidence was properly allowed to go to the jury.

Id. at 200 (footnote omitted).

As the Supreme Court did in Neil, we review the facts of this case to determine whether "the identification 'was so impermissibly suggestive' as to give rise to a very substantial likelihood of irreparable misidentification."  United States v. Burbridge, 252 F.3d 775, 780 (5th Cir. 2001) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); United States v. Watkins, 741 F.2d 692,

7

694 (5th Cir. 1984) (holding that an identification procedure violates due process when it is unnecessarily suggestive and conducive to irreparable mistaken identification).

Hefferon pointed the district court to several alleged "unduly suggestive" circumstances of the show-up, such as the timing of the show-up (it took place at midnight, at least two hours after Alejandra's normal bedtime and at least an hour-and-a-half after the encounter), the presentation of Hefferon to the victim (the handcuffed Defendant was presented to the victim flanked by two armed military officers) and the alleged preparation of the victim for the identification (the identification took place after the victim overheard a conversation between the investigating officer and her parents regarding Hefferon). The district court rejected these arguments. It found that while Hefferon's hands were cuffed behind his back, the victim could not see the handcuffs, and that although it was midnight, the identification area was well lit. Further, although the identification took place several hours after Alejandra's normal bedtime, the facts demonstrate that Alejandra was alert at the time of the identification. For example, when she first saw Hefferon before formally identifying him, Alejandra visibly reacted in fear by jumping behind her mother. This is not the reaction of a sleepy-eyed seven-year-old. She then affirmatively answered "Yes" to the officer's question whether Hefferon was her assailant. Officers Davis and Long, who witnessed the identification, testified that the victim's identification of

Hefferon was certain and positive.

Hefferon contends that Alejandra's fearful reaction was caused by the armed officers rather than him.  We are not persuaded.  The incident occurred at a military base.  Her father is a Captain in the military and the family has resided at various military bases throughout the world.  The presence of armed military officers is not novel for this child.  Support exists for the district court finding that the fearful stimulus was Hefferon.

The district court also found that because "the assailant forced the seven-year-old victim to perform an act of fellatio, she tragically had ample opportunity to view her assailant at the time of the crime, and her attention was focused in a way she will not soon, if ever, forget."  We agree.  Both Alejandra and Arlene testified that the assailant spoke to Alejandra, telling her to keep the encounter a secret, and Alejandra testified that her assailant played a game with her which required her to find a hiding place for him.  During this time, her focus was on her assailant.  She clearly had the opportunity to view her assailant carefully.  Moreover, the length of time between the encounter and the confrontation was minimal — a one-to-two hour gap between the encounter and the confrontation — and significantly shorter than the seven-month gap addressed in Neil.

The show-up identification procedure employed at the temporary lodging facility was not impermissibly suggestive to Alejandra who

9

had already identified "Big John" as her assailant.[2] However, even if the show-up were found to be unduly suggestive, the identification procedure used did not result in a substantial likelihood of misidentification. See Manson v. Brathwaite, 432 U.S. 98, 105 (1977) (although the identification procedure was suggestive in that only one photograph was used and no emergency or exigent circumstance required this type of procedure to be employed, no substantial likelihood of irreparable misidentification existed where the identification was made by a trained police officer); Neil, 409 U.S. at 200 (even if unduly suggestive, the victim's good record for reliability led the court to find no substantial likelihood of misidentification); United States v. Merkt, 794 F.2d 950, 957 (5th Cir. 1986) (female photo array was unduly suggestive, but the witness's identification of the defendant was sufficiently reliable to outweigh the corruptive effect of the array). A thread of reliability supporting this conclusion runs throughout this out-of-court identification —

---

[2]    We distinguish this case from the factual scenario encountered by our court in United States v. Shaw, 894 F.2d 689, 692 (5th Cir. 1990). There, an alleged bank robber was presented in a one-on-one show-up to a bank teller witness, in handcuffs, flanked by police officers. The witness had no prior knowledge of the defendant and could not identify him in a black and white photo array presented to her before the show-up. Thus, while the one-on-one show-up was found to be reliable, it was held to be unduly suggestive under the totality of the circumstances test. Id. Contrarily, Alejandra knew "Big John" and had previously identified him by name and room. Further, there were no prior attempts to have Alejandra identify her assailant by line-up or photo array.

10

Alejandra knew her assailant.  Before the show-up, Alejandra had already identified her assailant as the man in room 205, the room indisputably assigned to Hefferon.  She had previously gone to his room in search of his son, who she and her siblings referred to as "Little John."  She and her siblings knew "Big John" and played with "Little John."  Alejandra testified that she was afraid to tell her brother and sister about her assailant because "he" was right above them, in room 205.  The record is replete with indicia of reliability bolstering the out-of-court identification.[3]  The unique circumstances of this case, particularly the immediate fearful reaction evoked from Alejandra upon seeing Hefferon and the victim's prior knowledge of Hefferon, belie a holding that a substantial likelihood of misidentification resulted from the identification procedure employed.

B.    **Comment by the District Court**

Hefferon alleges that his due process and fair trial rights

---

[3]    Contrary to Hefferon's assertions, the reliability of the show-up identification is not lessened by Alejandra's inability to identify him as "Big John" in court.  The government offered testimony at trial from an officer who compared a photograph of Hefferon at the time of his arrest to Hefferon's in-court appearance.  He noted that Hefferon was wearing glasses and a suit in court, had lighter hair than he did at the time of his arrest and had lost a significant amount of weight while incarcerated before his trial setting.  The officer himself testified that he initially had trouble identifying Hefferon in the courtroom.  The fact that neither Alejandra nor Arlene could recognize "Big John" over ten months after the encounter when his appearance had undoubtedly changed was properly weighed by the jury.  However, it does not dictate a bar, on due process grounds, of the out-of-court identification.

11

were violated when the district court inappropriately commented on the evidence.

Neither Alejandra nor Arlene could identify Hefferon in court. Following a recess, Orlando was able to identify Hefferon as "Big John." On cross-examination, when asked by the defense counsel if the prosecutor told him to "[m]ake sure that you say that is Big John," Orlando responded affirmatively.[4] On redirect, the government elicited testimony from Orlando that the prosecutor had first asked him if he could recognize anybody in the courtroom and that he, on his own, responded by stating that he recognized "Big John." All three children were also questioned extensively by the defense counsel on the government's preparation of them, including the number of times the prosecutors met with them and whether the prosecutors repeatedly asked them the same questions to help

---

[4] The cross-examination of Orlando, in relevant part, reads:

Q: Do you recall the recess, the break?
A: Yes.
. . .
Q: Do you remember this lady coming up to you and looking at that man?
. . .
A: No, it was the man sitting next to him [sic].
. . .
Q: And, did he look at the man [the Defendant] at the table over there?
A: Yes.
Q: Okay. And did he tell you, "Make sure that you say that is Big John?"
A: Yes.

12

prepare them for in-court questioning.[5]

Later in the trial, during the cross-examination of the defense expert, John Guerrero, the government was able to get the expert to concede that given Alejandra's prior interactions with Hefferon, the out-of-court identification of Hefferon by Alejandra "look[ed] real good." On re-direct, the defense sought Guerrero's opinion on the effect of coaching on a witness's testimony. The government objected and the district court overruled the objection. In so doing, it made the comment at issue on appeal during the following exchange:

> Q: How good is the ID looking when the Prosecutors tell the child "make sure that when you go into court you say that it is Big John"
>
> Mr. Contreras: Objection, Your Honor. There is no evidence of that.
>
> The Court: There is no evidence that that occurred.
>
> Mr. Villarreal: Your Honor –
>
> The Court: No, there is not. Now if you can give me some proof that they did that I will put

---

[5] For example, the following exchange took place between the defense counsel and Alejandra:

Q: Did you feel you already knew what questions they were going to ask you?
A: Umm, some of them.
Q: Because, they had spoken to you five or four times.
A: Yes.
Q: And, when they came back to talk to you some more, you already had an idea of what questions they [the prosecutors] were going to ask?
A: Yes.
Q: So, to you, was it kind of like practicing your answers?
A: Yes . . . .

13

them in jail. This is the fourth or fifth time you say they are doing something and they are not. Now, you can proceed.

Hefferon maintains that he was attempting to prove the prosecution coached the child witnesses to identify Alejandra's assailant as "Big John," and that the district court's comment improperly informed the jury that this defense was without merit.

It is well-settled that it is "within the prerogative of a federal judge to manage the pace of a trial, to comment on the evidence, and even to question witnesses and elicit facts not yet adduced or clarify those previously presented." E.g., United States v. Reyes, 227 F.3d 263, 265 (5th Cir. 2000); see also Calif. Ins. Co. v. Union Compress Co., 133 U.S. 387, 417 (1890) ("In the courts of the United States, as in those in England, from which our practice was derived, the judge, in submitting a case to a jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, call their attention to parts of it which he thinks important, and express his opinion upon the facts . . . .") (quotation and citation omitted); United States v. Blevins, 555 F.2d 1236, 1240 (5th Cir. 1977). This prerogative, however, is curtailed by the requirement that the trial judge not give the appearance of partiality, a determination which is made by examining the record in its entirety. See United States v. Cantu, 167 F.3d 198, 202 (5th Cir. 1999); see also United States v. Munoz, 150 F.3d 401, 413 (5th Cir. 1998) ("We must determine whether the

14

trial judge's inquiry was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.").

In the context of this case, the comment by the district court did not have a significant impact on the jury and did not give the appearance of partiality. The questions posed to Mr. Guerrero by the government related to Alejandra's out-of-court identification (the show-up) of Hefferon. When pressed by the prosecutor, the expert admitted that the one-on-one identification of Hefferon by Alejandra gained reliability from Alejandra's prior knowledge of her assailant and the prior identification of her assailant by name and room location. The defense counsel's re-direct, to which the trial court's comment was directed, focused on testimony elicited by the defense from Orlando, not Alejandra, regarding alleged "coaching" by the government. In context, therefore, the comment from the district court that "there is no evidence that that occurred," is technically true as to Alejandra. The district court appears to have been legitimately concerned with poisoning the identification made by Alejandra with the testimony of Orlando. And while perhaps overcompensating for this concern, the single comment made by the district court in the context of a two-day trial, in which thirteen witnesses testified, does not require reversal. See Reyes, 227 F.3d at 265-66 (questions by the trial judge to six of the seven witnesses which apparently favored the prosecution, though improper in at least two instances, did not

15

have the cumulative effect of depriving defendant of his constitutional rights); Munoz, 150 F.3d at 401 (there was no possibility that the trial judge's role was confused with that of the jury through his questions to the witness; viewed as a whole, the intervention was not quantitatively and qualitatively substantial enough); United States v. Wallace, 32 F.3d 921, 926 (5th Cir. 1994) (improper comments by the trial court allegedly bolstering the government witness's credibility and statements in front of the jury that the defense motion was frivolous did not substantially prejudice the defense, especially where the instruction to disregard comments cured error); United States v. Carpenter, 776 F.2d 1291, 1295-96 (5th Cir. 1985) (comment by the trial court to the defense counsel that it had still not heard a defense was improper but not so substantial or prejudicial as to require reversal).

Quercia v. United States, 289 U.S. 466, 468-69 (1933), the case principally relied on by the Defendant in support of his position that the district court took a critical issue away from the jury, is distinguishable from this case. The trial judge in Quercia stated that he was "going to tell you [the jury] what [he] th[ought] of the defendant's testimony," and proceeded to state the following: "You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying." Id. This statement is tantamount to saying the defendant is guilty. As

16

found by the Supreme Court, the trial judge put his own experience in the scale against the accused. Id. at 472. The comparatively mild comment by the trial court in the instant case simply does not cripple Hefferon's defense in the manner demonstrated in Quercia. Hefferon was allowed to pose a substantial number of questions to all three children regarding the government's method of interviewing and preparing the child witnesses. Further, the jury charge included the following curative instruction:

> Also, do not assume from anything I have done or said during the trial that I have any opinion concerning any issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the fact.

Juries are presumed to follow their instructions. Zafiro v. United States, 506 U.S. 534, 540-41 (1993); see also United States v. Garcia Abrego, 86 F.3d 394, 401-02 (5th Cir. 1996) (curative instruction to the jury remedied any prejudice arising from the district court's comment on defendants' nationality during voir dire). The comment in this case does not require reversal.

## C. Excited Utterance

Prior to and during trial, Hefferon objected to testimony from Alejandra and the members of her family regarding Alejandra's out-of-court statements about "Big John" and "the man in room 205," arguing that the statements were unreliable hearsay and that any probative worth was outweighed by the danger of unfair prejudice.

17

The district court overruled the objections and admitted the statements. Hefferon appeals this ruling, contending that the statements do not fall within the excited utterance exception to the hearsay rule because they were not closely related in time to the occurrence and there was ample opportunity for others to influence Alejandra's responses.

The court reviews a district court's exclusion of evidence for an abuse of discretion. See Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1329 (5th Cir. 1996). Furthermore, if this court finds an abuse of discretion in the admission or exclusion of evidence, we review the error under the harmless error doctrine, under which we will affirm the evidentiary rulings unless they affect a substantial right of the Defendant. See United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996).

Following a suppression hearing, the trial court made several findings regarding the victim's emotional state. It found that the victim was still highly traumatized by the event at the time she made statements to her family members and to the security officer who investigated the assault and that these statements were all made within one-to-two hours of the encounter. The district court also found that the statements of her two minor siblings regarding the encounter were made under the trauma of their sister's assault and likewise bear adequate "indicia of reliability."

The admission of the statements made by Alejandra was not an abuse of discretion. The statements indisputably relate to a

18

startling event or condition, and Alejandra was under the stress of excitement caused by the event when she made them.  See FED. R. EVID. 803(2) (rule excepting from hearsay definition those "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").  Several courts of appeals have lowered the evidentiary bar to the admission of like-related evidence when the victim declarant is a young child, recognizing that the possibility of fabrication and coaching are limited and the likelihood that the trauma from the startling event will remain with the child for some time after the encounter is strong.  See, e.g., United States v. Rivera, 43 F.3d 1291, 1296 (9th Cir. 1995) (statement made a half hour after an assault occurred qualified as an excited utterance because "[r]ather than focusing solely on the time a statement was made, we consider other factors, including the age of the declarant, the characteristics of the event and the subject matter of the statements"); United States v. Farley, 992 F.2d 1122, 1123 (10th Cir. 1993) (statement of a young child made the day following molestation could have been admitted as an excited utterance where the child was described as frightened and on the verge of tears); Morgan v. Foretich, 846 F.2d 941, 947 (4th Cir. 1988) (four-year-old's statements made within three hours of returning from sexually abusive father's home fell within exception because "courts must also be cognizant of the child's first real opportunity to report the incident"); United States v. Iron Shell, 633 F.2d 77, 85-86

19

(8th Cir. 1980) (nine-year-old's statements elicited by a police officer between forty-five minutes and one hour and fifteen minutes after an assault fell within the excited utterance exception); United States v. Nick, 604 F.2d 1199, 1202 (9th Cir. 1979) (three-year-old's statements within hours of molestation were admissible).

We turn next to the district court's conclusion, in its order on Hefferon's motion in limine, that the out-of-court statements of Arlene and Orlando fall within the excited utterance exception. Assuming, without deciding, that the statements are hearsay and fall outside the excited utterance exception, the district court's pre-trial ruling — admitting in blanket form statements made by Arlene and Orlando — nevertheless constitutes harmless error. See Skipper, 74 F.3d at 612 (we review the error under the harmless error doctrine, under which we will affirm the evidentiary rulings unless they affect a substantial right of the Defendant).

We note that while Hefferon generally objects to the district court's motion in limine ruling on the admission of statements by Alejandra's siblings under the excited utterance exception and the district court's ruling on Hefferon's running objection in court to the admission of these statements, he does not point the court to any specific out-of-court statement by the siblings that was erroneously admitted over his objection. The only references to out-of-court statements by the siblings found by this court in its independent review of the record are references in the testimony of

20

Alejandra's mother and father.[6] Both testified about Orlando's out-of-court statements to his father regarding Alejandra's account of the encounter. They also recalled Arlene's out-of-court statement of how she had seen Alejandra with "Big John." However, Orlando's statements simply retrace what Alejandra told her siblings, which, as stated above, is admissible under the excited utterance exception and was testified to by Alejandra, Arlene and Orlando. Further, Arlene herself testified in court as to what she witnessed. As such, the testimony was cumulative and the error harmless. See Skipper, 74 F.3d at 612. A substantial right of Hefferon was not affected. Id.; see also United States v. Williams, 957 F.2d 1238, 1244 (5th Cir.1992)("In a harmless error examination, '[w]e must view the error, not in isolation, but in relation to the entire proceedings.'") (quoting United States v. Brown, 692 F.2d 345, 350 (5th Cir. 1982)).

Finally, Hefferon's argument that the trial court erred in admitting the evidence over his Federal Rule of Evidence 403 objection is without merit. It is axiomatic that Alejandra's out-of-court statements regarding her encounter with "Big John" are prejudicial to Hefferon. However, on balance, the district court's determination that this prejudice is outweighed by the probative

---

[6] Orlando himself testified that because Alejandra was too upset to explain to her father what had happened, he told his father what Alejandra had previously said to him and Arlene. However, he does not specifically testify as to the substance of his speech. Thus, his explanation of events does not implicate the hearsay rules of evidence.

value of the evidence is not improper.  <u>Green v. Bock Laundry Machine Co.</u>, 490 U.S. 504, 506 (1989) (discussing the balancing test under FED. R. EVID. 403); <u>United States v. Asibor</u>, 109 F.3d 1023, 1034 (5th Cir. 1997) (same).

**D.  Sufficiency of the Evidence**

Clearly, the contested issue at trial was whether Hefferon was Alejandra's assailant.  There was no physical or medical evidence linking Hefferon to the alleged assault.  Nevertheless, the facts of this case, particularly the fact that the victim knew her assailant, support the jury's conviction.  In addition to Alejandra's out-of-court statements regarding "Big John" and "the man in room 205" as her assailant, Arlene witnessed "Big John" reminding Alejandra that the encounter was to be kept secret.  <u>See</u> <u>United States v. Garcia-Flores</u>, 246 F.3d 451, 453 (5th Cir. 2001) (evidence must be reviewed in the light most favorable to the prosecution to determine whether any reasonable jury could have found the essential elements of the crime beyond a reasonable doubt).  Ample support exists for the jury finding that the government met its burden of proof on identity.

**II.  Defendant's Sentence**

Hefferon also disputes the district court's imposition of an upward adjustment for abduction of the victim, and an upward departure for the inadequacy of Hefferon's criminal history, extreme psychological injury to the victim and multiple assaults of

22

the victim.

We review the application of the sentencing guidelines <u>de novo</u> and the district court's findings of fact for clear error.  <u>United States v. Jefferson</u>, 258 F.3d 405, 411 (5th Cir. 2001); <u>United States v. Wimbish</u>, 980 F.2d 312 (5th Cir. 1992).

**A.    Abduction of the Victim**

Hefferon received a four-level upward adjustment (from a base offense level of twenty-seven) for his "abduction" of Alejandra. Hefferon contests this adjustment, contending that to be "abducted," a victim must be physically forced from one location to another.[7]

The Criminal Sexual Abuse Guideline, § 2A3.1(b)(5), states, under the Specific Offense Characteristics subsection, that "[i]f the victim was abducted, increase by 4 levels."  U.S. SENTENCING GUIDELINES MANUAL, § 2A3.1(b)(5).  The Criminal Sexual Abuse Guideline itself does not define "abduction."  However, the commentary to the Application Instructions define "abducted" to mean "that a victim was forced to accompany an offender to a different location.  For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute abduction."  U.S. SENTENCING GUIDELINES MANUAL, § 1B1.1 cmt. (1)(a) (2000).

In <u>United States v. Hawkins</u>, 87 F.3d 722 (5th Cir. 1996), this

---

[7]    Hefferon objected to the probation officer's recommended adjustment for abduction in a Sentencing Memorandum submitted to the district court.  He also objected to the adjustment at the sentencing hearing.

23

court considered whether the district court erred in imposing an upward adjustment for abduction under the robbery Guideline. <u>Id</u>. at 726. There, following beatings by the defendant at one location in the parking area, the defendant's victims were forced at gunpoint to move to another location in the same parking area some fifty-to-sixty feet away. The defendant objected to the adjustment, averring that movement some fifty-to-sixty feet in the same parking area did not constitute "a different location" within the meaning of the commentary. After surveying case law on the issue from other courts of appeals, we joined those courts interpreting the term "a different location" "to be flexible and thus susceptible of multiple interpretations, which are to be applied case by case to the particular facts under scrutiny." <u>Id.</u> at 728.

<u>Hawkins</u> is instructional to us in at least two respects. First, it aids us in reaching the conclusion that Alejandra was moved "to a different location" within the meaning of the commentary. Hefferon moved Alejandra from some trees near the playground, where he first sexually assaulted her, to the garbage repository, where he again assaulted her. Application of the adjustment provision under § 2A3.1(b)(5) is not precluded merely because the different location is on the same lodging facility property. As we stated in <u>Hawkins</u>, the term should not be applied "mechanically based on the presence or absence of doorways, lot lines, thresholds, and the like." <u>Id</u>.

24

Hawkins is helpful in another respect.  As discussed below, its liberal construction of the term "a different location"  is persuasive in our interpretation of the word "forced" in the term "forced to accompany" found in the commentary to the Application Instructions.

Hefferon maintains that implied in the term "forced to accompany" is a requirement that the force or coercion be physical.  Because Hefferon did not utilize physical force on his victim when he enticed her with trickery to move from her room to the trees near the playground and then to the garbage repository, he contends the adjustment was improper.  We cannot concur.

The Seventh Circuit considered a case in which a defendant, pretended to be "Kyle," a fifteen-year-old boy and later his twenty-year-old brother, to the twelve-year-old victim he corresponded with over an internet site devoted to UFO's.  United States v. Romero, 189 F.3d 576, 578 (7th Cir. 1999), cert. denied, 529 U.S. 1011 (2000).  The defendant dominated the victim's vulnerable state (the victim was young, had severe emotional problems, and had been diagnosed with Attention Deficit Disorder) and ultimately enticed the victim to run away with him.  Id.  On appeal, the defendant argued the district court erroneously enhanced his sentence for abduction where no actual or threatened force was applied to the victim.  Id. at 589.  Disagreeing, the Seventh Circuit held that for purposes of "abduction" under U.S.S.G. § 2A3.1(b)(5), it did not matter whether the kidnapping

25

was committed by physical force or a "force substitute" such as inveigling.  Id. at 590.

Likewise, the Eighth Circuit in United States v. Saknikent, 30 F.3d 1012, 1013 (8th Cir. 1994), considered a factual circumstance similar to Romero.  The victim in Saknikent was a child under twelve whose mental development was substantially below normal. The victim disappeared from a convenience store and was later found with the defendant, miles from her South Dakota town.  Id.  On appeal, the defendant argued that because there was no evidence that he forced the victim to accompany him, the adjustment for abduction was erroneous.  Like the Seventh Circuit, the Eighth Circuit rejected this narrow definition of "force," and stated that,

> Abduction increases the gravity of sexual assault or other crimes because the perpetrator's ability to isolate the victim increases the likelihood that the victim will be harmed.  Any concomitant assault is tangential to the rationale for the increased penalty.  Also, "forced" does not necessarily imply a physical assault. To "force" means to compel "by physical, moral, or intellectual means," or "to impose" or "to win one's way."  WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 326 (1970).  "Force" can also mean "constraining power, compulsion; strength directed to an end."  BLACK'S LAW DICTIONARY 644 (6th ed. 1990). The level of "force" necessary to overcome another's will to resist is directly proportional to the development of the other's will. [The defendant's] interpretation of "force" ignores this fact, and would result in less punishment for those who isolate the very young and very vulnerable whose wills are either undeveloped or can be overcome with less than a full blown assault.  Such inconsistency cannot be intended.

Id. at 1013-14 (internal footnote omitted).

We think the term "forced to accompany" was not meant to preclude adjustments where the force applied was by means of "veiled coercion" rather than brute physical strength, at least in a situation, such as that before the court, where the victim is easily overcome by veiled coercion.[8] We reject the rigid definition of "forced" urged by Hefferon. The word "forced" in the term "forced to accompany," like the term "a different location," is "to be flexible and thus susceptible of multiple interpretations, which are to be applied case by case to the particular facts under scrutiny . . . ." Hawkins, 87 F.3d at 726.

---

[8] The First Circuit encountered a situation under the Extortion Guideline in which to define the parameters of the word "forced." United States v. Cunningham, 201 F.3d 20 (1st Cir. 2000). The victim, an adult male with no stated developmental or emotional difficulties, failed to make payments on a loan made to him by the defendant at an extremely high interest rate. Id. at 27. The defendant tricked the victim into moving to "another location" by telling him that a good friend of his needed to speak with him. When the victim arrived at the new location, the defendant and several others beat him with lead pipes and tire irons. Id. The First Circuit noted that the factual scenarios addressed by the Seventh and Eighth Circuits both "involve the abduction of children by trickery or inveigling," but nevertheless stated that "the age of the victim need not be dispositive." Id. at 28. It then adopted a definition of "force" that encompassed its "common meaning" – to compel by physical, moral, or intellectual means. It thus held that "the word 'force' in no way suggests that the force exerted must be of a physical or violent nature. There is nothing in the plain meaning of the guideline to suggest that the force used must be physical." Id.; see also United States v. Whooten, 279 F.3d 58, 61 (1st Cir. 2002) ("This Court has observed that the abduction enhancement is intended, at least in part, to protect victims against additional harm that may result from the victim's isolation, and thus applies whether the abduction is carried out by threat or by physical force."), cert. denied, 122 S. Ct. 2376 (2002). The case before our court does not require us to opine on whether we would define "abduction" as flexibly as the First Circuit apparently has.

27

At sentencing, the district court found,

> the Defendant abducted the victim by appealing to a
> seven-year-old sense of obedience to adults and because
> of her inability to make assessments of that kind,
> Defendant was able to abduct her through a means of
> veiled coercion. He was able to isolate the victim by
> dominating her lack of intellectual ability, and also by
> appealing to the credulous nature of a seven-year-old.

The district court correctly held that Alejandra was "abducted" within the meaning of the Guideline.

## B. Upward Departure

A district court may depart upward from the Sentencing Guidelines if the court finds the existence of an aggravating circumstance that was not adequately taken into consideration by the Guidelines. 18 U.S.C. § 3553(b); United States v. Koon, 518 U.S. 81, 96-100 (1996) (enunciating the standard of review for upward departures); United States v. Ashburn, 38 F.3d 803, 807 (5th Cir. 1994) (en banc). If the district court departs upward, it must state the specific reason for doing so. Id. We review the district court's decision to depart upward for abuse of discretion and shall affirm an upward departure if (1) the district court gives acceptable reasons for departing, and (2) the extent of the departure is reasonable. Id. The district court has wide discretion in determining the extent of departure. Id.

### 1. Inadequacy of the Defendant's Criminal History

The Sentencing Guidelines permit an upward departure, "if reliable information indicates that the criminal history does not

28

adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S. SENTENCING GUIDELINES MANUAL, § 4A1.3 (2000). Section 4A1.3(e) of the Guidelines also specifies that departure may be based upon "prior similar conduct not resulting in a criminal conviction." Id. § 4A1.3(e); see also United States v. Ashburn, 38 F.3d 803, 808 (5th Cir. 1994) (upholding district court's upward departure of more than twice the recommended guideline range on grounds that the defendant's criminal history category significantly underrepresented the seriousness of his criminal history and the likelihood that he would commit similar crimes in the future).

The Pre-Sentence Report included four examples of Hefferon's alleged involvement in sexual conduct with minors. At sentencing, the government presented the testimony of a number of victims from these alleged incidents. A ten-year-old child testified that on three separate occasions Hefferon exposed himself to her when she was six. A nineteen-year-old testified that Hefferon fondled her against her will when she was fifteen. A sixteen-year-old testified that Hefferon tricked her into entering his apartment when she was six. Before she could leave the apartment, she alleged that he showed her a pornographic movie, dropped his pants, put an elephant mask around his penis, and asked her to take her

pants off.[9]  The district court found the testimony of the witnesses credible.  It further found that this criminal behavior had persisted for a long time.  Holding that the Guidelines did not fully consider his criminal history in determining the range for sentencing, it departed upward.

The district court did not abuse its discretion in departing upward based on the inadequacy of Hefferon's criminal history.  The three incidents considered by the district court all involved young girls as the victim and the behavior attributed to Hefferon was sexual in nature.  We disagree with Hefferon's assertion that these incidents are factually dissimilar to the instant incident for departure purposes.

## 2. Extreme Psychological Injury to the Victim

Hefferon also contends that the district court erred in departing upward based on the extreme psychological injury suffered by Alejandra.  Section 5K2.3 provides,

> If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.

> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only

---

[9]  A woman who formerly worked at a day care operated out of Hefferon's home also testified that Hefferon massaged a sixteen-month-old's vagina.  The district court did not consider this incident credible.

> when there is a substantial impairment of the
> intellectual, psychological, emotional, or behavioral
> functioning of a victim, when the impairment is likely to
> be of an extended or continuous duration, and when the
> impairment manifests itself by physical or psychological
> symptoms or by changes in behavior patterns. The court
> should consider the extent to which such harm was likely,
> given the nature of the defendant's conduct.

U.S. SENTENCING GUIDELINES MANUAL, § 5K2.3 (2000)  We have previously stated that "[a] psychological injury is sufficiently severe where there exists (1) a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, (2) which is of an extended or continuous duration, and (3) which manifests itself by physical or psychological symptoms or by changes in behavior patterns." United States v. Anderson, 5 F.3d 795, 804 (5th Cir. 1993).

Using this framework as a guidepost, we hold that the district court did not abuse its discretion in departing upward for extreme psychological injury.  At sentencing, it found credible the representation of Alejandra's treatment manager (Dr. Rotering) that the victim will suffer long-term psychological affects, such as lack of trust (especially of adults), that are excessively severe. Dr. Rotering testified that she has evaluated hundreds of victims of sexual abuse and that Alejandra's trauma was "the most severe of anybody [she] ha[d] ever worked with."  Additionally, the record demonstrates that the trauma suffered by Alejandra manifests itself physically.  On several occasions, when Alejandra was asked to talk about the incident, she became physically ill.  This physical

31

manifestation (severe crying, vomiting, and fever) was described by Dr. Rotering as a symptom generally associated with a patient suffering from Post Traumatic Stress Disorder, a disorder characterized by Dr. Rotering as having ongoing and severe symptoms. Family members also testified that Alejandra had become introverted and aggressive. The district court did not abuse its discretion in departing upward.[10]

### 3. Multiple Assaults

Comment 5 to § 2A3.1 of the Criminal Sexual Abuse Guideline, in effect at the time Hefferon was sentenced, provides that,

> if a defendant was convicted (A) of more than one act of criminal sexual abuse and the counts are grouped under § 3D1.2 (Groups of Closely Related Counts), or (B) of only one such act but the court determines that the offense involved multiple acts of criminal sexual abuse of the same victim or different victims, an upward departure would be warranted.

U.S. SENTENCING GUIDELINES MANUAL, § 2A3.1 cmt. 5 (2000). Pursuant to this comment, the district court departed upward two levels because it found the offense at issue involved multiple acts of criminal

---

[10] The fact that Alejandra's physical manifestations did not appear in Dr. Rotering's notes does not require vacation of the sentence. Adequate support exists in the record for the trial court's finding that the psychological injury manifested itself physically. At sentencing, the trial judge remarked that he "was the closest person to that child [the victim] and that child was most visibly trembling and frightened beyond any measure." Further, several family members testified that Alejandra became physically ill whenever she was asked to discuss the encounter. Moreover, the government represented that when investigators traveled to Germany to talk to Alejandra about the incident, she became physically ill and could not speak to them.

sexual abuse of the same victim. As stated by the district court, "[f]irst [the Defendant] coerced her to touch his penis, then he essentially let her go, only to coerce her again. On the second occasion he not only coerced her to touch his penis[,] he also forced her to perform oral sex on him." The district court did not err in determining that Hefferon's offense involved multiple acts of criminal sexual abuse of the same victim. See United States v. Jefferson, 258 F.3d 405, 411 (5th Cir. 2001); see also Williams v. United States, 503 U.S. 193 (1992) ("Although the Act established a limited appellate review of sentencing decisions, it did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion . . . . The development of the guideline sentencing regime has not changed our view that, except to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.'") (citation omitted).

## CONCLUSION

The evidence was sufficient for the government to prove its case beyond a reasonable doubt. Further, no error requires vacation of the sentence imposed by the district court. Hefferon's conviction and his sentence are AFFIRMED.