United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 1, 2006**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 29, 2006
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-70026

JOHN JOE AMADOR

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas, San Antonio
No. 5:02-CV-230

Before JONES, Chief Judge, and KING and DENNIS, Circuit Judges.

KING, Circuit Judge:

In this capital murder case, petitioner John Joe Amador
appeals the district court's dismissal of his petition for writ
of habeas corpus under 28 U.S.C. § 2254 on two of his claims that
he was denied effective assistance of counsel in violation of his
Sixth Amendment rights during the direct appeal of his conviction
before the Texas Court of Criminal Appeals.  For the following
reasons, we AFFIRM the judgment of the district court.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Criminal Proceedings

### 1. The Crime and Aftermath

#### a. The Crime

During the early morning of January 4, 1994, taxicab driver Reza "Ray" Ayari stopped to pick up his friend Esther Garza, who occasionally accompanied Ayari during his shifts. Garza had been drinking heavily that night and had sought Ayari's company because she was upset over a fight she had recently had with her boyfriend. According to Garza's testimony, between 3:00 a.m. and 3:30 a.m., Ayari stopped on the west side of San Antonio, Texas, to pick up two passengers, later identified as eighteen-year-old John Joe Amador and his sixteen-year-old cousin Sara Rivas. Amador asked Ayari to take them to Poteet, Texas, a town approximately thirty minutes southwest of San Antonio. Ayari replied that he would need twenty dollars in advance. Amador indicated that he did not have twenty dollars, but directed Ayari to a house where he could obtain the money. The house was later identified as that of Amador's girlfriend, Yvonne Martinez. The cab stopped at Martinez's house, Amador returned with the money, and the four occupants--Ayari in the driver's seat, Garza in the front passenger seat, Amador in the seat behind Ayari, and Rivas in the seat behind Garza--proceeded to Poteet.

Garza testified that when they reached rural Bexar County, the passengers directed Ayari to stop in front of a house with a long driveway.  As Ayari drove toward the house, he was shot in the back of the head without warning.  Garza was shot immediately thereafter.  Garza, who was still alive despite sustaining a gunshot wound to the left side of her face, later testified that she feigned death as Amador and Rivas pulled Ayari and Garza out of the car, searched Garza's pockets, and drove off down the driveway, damaging the cab in the process.  When police arrived at the scene of the shootings, they found Ayari dead.  Garza was bleeding from the head and face, hysterical, and unable to speak coherently.  She was eventually able to tell the officers at the scene that one of the suspects was male, that she had never seen him before, and that he was 6'1", possibly of Arabic ethnicity, and had short black hair.[1]  Officers found .380 and .25 caliber shell casings at the scene, and a .25 caliber bullet was removed from Garza's nasal cavity that night at the hospital.  The cab was eventually found abandoned in a median in the outskirts of San Antonio, and a woman named Esther Menchaca later testified that she had observed two people who resembled Amador and Rivas walking away from the cab in the median as she drove to work in the early morning of January 4.

---

[1]  It is undisputed that John Joe Amador is 5'6" and Hispanic.

-3-

### b. The Investigation

On January 10, 1994, after Garza had been released from the hospital, she gave the Bexar County Sheriff's Office a description of the suspect to aid in creating a composite sketch. Garza also spoke with lead investigator Detective Robert Morales and gave a written statement, which reaffirmed the description she had given at the scene, although she described the suspect as Hispanic rather than Arabic as she had originally stated.

On January 24, 1994, acting on an anonymous "Crime Stoppers" tip, a Bexar County Sheriff's Deputy picked up Amador and his girlfriend Yvonne Martinez from a San Antonio school and took them to the sheriff's department for questioning. Both denied any knowledge of or involvement in the shootings. Officers also took their pictures and prepared photo arrays to present to Garza, the only eyewitness to the crime. While Amador and Martinez were still being questioned, Detective Morales drove Garza to the sheriff's department. Garza testified at a pretrial hearing that Detective Morales showed her the photo array containing Martinez's picture while they were in the car en route to the sheriff's department.[2] While Garza did not identify any

---

[2] The trial transcript reveals a number of discrepancies in the testimony of various witnesses regarding the dates that Garza was shown photo arrays, how many photo arrays she was shown, and whether the suspects' photos were included in each photo array that she viewed. However, it is undisputed that Garza was unable to identify Amador from a photo array or otherwise prior to March 30, 1994.

of the women in the photo array as a suspect, she did identify Martinez as someone she knew from work and stated that Martinez was definitely not the woman in Ayari's cab the night of the shootings. When Garza arrived at the sheriff's department, the officers showed her a second photo array, this time containing pictures of Hispanic males.[3] Garza was unable to identify any of the men as a suspect. The officers then took her on a "show up" to view Amador and Martinez, instructing her to look through holes that had been cut in a piece of cardboard that was taped against the window of the homicide office where Amador, Martinez, and a sheriff's deputy were sitting. Garza once again identified Martinez as a former co-worker and confirmed that she had not been in the cab on the night of the shootings. However, she was unable to identify Amador as the male passenger in the car on the night of the shootings, telling the officers that she did not know whether he was the shooter and that "I'm just not up to that right now."

The following day, the officers asked Garza if she would consent to be hypnotized in an effort to enhance her memory and

---

[3] It is also unclear from the record whether this photo array contained a picture of Amador. The district court noted that Sergeant Sal Marin testified that, to his personal knowledge, no photo arrays prior to March 30, 1994, contained a photo of Amador. See Dist. Ct. Order n.27. However, the record reflects that Detective Morales handled most of the photo arrays, and it is unclear from his testimony and from the rest of the record which photo arrays contained photos of Amador and which did not.

make her more confident in her identification.  Garza agreed, and on February 3, 1994, she underwent hypnosis performed by Brian Price, a Bexar County Adult Probation Officer who had training as an investigative hypnotist.  During the session, she confirmed her description of the suspect as a 6'1" Hispanic male.  Based on her description, a sketch artist rendered another composite drawing of the suspect.

On March 16, 1994, Garza called Detective Morales and informed him that a friend had told her that the two people who had done the shootings were named John Joe Amador and Sara Rivas.  She subsequently revealed that the source of this information knew Martinez, whom the source had overheard talking about the crime and whom Garza had previously recognized as a former co-worker when Martinez was sitting with Amador during the show up in the Bexar County Sheriff's Office.  On March 30, 1994, the officers again showed Garza a photo array, and this time Garza was able to identify Amador as the male suspect in the cab on the night of the shootings.  The picture of Amador contained in the photo array was taken the same day that Garza had observed him with Martinez during the show up, and in the picture he was wearing the same black shirt.  She was unable to identify Rivas from another photo array.

An arrest warrant was issued for Amador, who had since gone to California.  An officer arrested Amador and brought him back to Texas; Rivas was also arrested.  On April 13, 1994, Rivas gave

a written statement to Detective Morales.  Rivas alleged in her

statement that Amador had shot and killed Ayari and that, at

Amador's instruction, she had shot Garza with a gun that Amador

had given her.[4]  Later that day, Sergeant Sal Marin told Amador

that Rivas had confessed to shooting someone at Amador's

direction.  Amador then gave a written statement to Sergeant

Marin which, while inculpatory, spoke in hypothetical terms.[5]

---

[4]  Rivas's statement was not admitted into evidence at Amador's criminal trial, but it was admitted during the pretrial evidentiary hearing concerning Amador's motion to suppress.

[5]  A partially redacted version of Amador's statement was admitted into evidence at trial and read in open court.  Trial Tr., Vol. XIX, pp. 167-69.

The portion of Amador's statement read into the record at trial is as follows:

> My name is John Joe Amador.  I am 18 years old and I live at 3907 Eldridge Street in San Antonio, Texas.  I have told Sergeant Marin that I am going to tell him about the murder of the taxicab driver and the shooting of a young girl.
>
> I am going to tell my side of the story the way I want it to come out.  I don't need no attorney or anything for this.  Sergeant Marin has read me my rights and I understand my rights.
>
> During the early part of January 1994, I don't remember the date other than it was sometime shortly after New Year's Day, this is when this mess all started.  It was during the night. I don't remember what time it was, but I do know it was late.
>
> They say I shot and killed a taxicab driver and my cousin Sara Rivas shot a young woman in the face.  If this is true, Sara would have shot the young woman because I would have ordered her to do it.  Sara is my cousin and she is not that type of a person.  She is from Houston and was visiting here in San Antonio when all of this

-7-

The next day, April 14, 1994, Amador contacted Sergeant Marin to inquire whether his cousin was all right. After assuring Amador that Rivas was fine, Sergeant Marin asked Amador to accompany him to the scene of the crime and help him locate the guns used in the shooting. Amador agreed to do so, but the weapons were never found. While at the scene, Amador mentioned that if he had committed the crime, he would have used .25 and .380 caliber handguns.

### c. Pretrial Hearing on Amador's Motion to Suppress

Prior to trial, Amador filed numerous written motions to suppress much of the prosecution's evidence, including, inter alia, objections to the admissibility of the statement that he made regarding the caliber of the guns used in the shooting and to the in-court identification of him by any witness. From May 22-24, 1995, the court held a pretrial hearing, which included the presentation of evidence and arguments concerning Amador's motions.

---

shit happened. She wanted to visit her grandma who lives near Poteet, Texas, but she never made it over there.

In this situation I would have handed her a gun and I would have ordered her to shoot the woman with that gun. If all of this stuff about the murder is true and they can prove it in court, then I will take my death sentence.

This is all I want to say. I don't want to say any more. I will just wait for my day in court.

Id.

### i. Amador's Oral Statement Identifying the Caliber of the Guns Used in the Crime

At the time of Amador's trial, Article 38.22, section 3 of the Texas Code of Criminal Procedure barred the use of statements by an accused resulting from a custodial interrogation at trial unless an exception applied. At the pretrial hearing, Sergeant Marin and Amador testified about their visit to the crime scene to search for the weapons. The trial court ultimately ruled that Amador's statement was admissible under Article 38.22, section 3 of the Texas Code of Criminal Procedure, which provided, in pertinent part:

> (a) No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> > (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement; . . .
>
> (c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

TEX. CRIM. PROC. CODE ANN. art. 38.22(3)(c) (Vernon Supp. 1994). Over Amador's objections, the trial court determined that Amador's statement was admissible under this statute because, although the statement was not recorded, "Sergeant Marin indicated that subsequently they did determine that statement to be true and it conduces to show his guilt of the offense." Trial

Tr., Vol. V, pp. 153-54.

### ii. Garza's In-Court Identification of Amador

Amador also argued that any in-court identification made by Garza was inadmissible because the out-of-court identification procedures had been unnecessary and suggestive in violation of Amador's due process rights. At the evidentiary hearing on May 22, 1995, Garza testified to the events leading up to the shooting, the out-of-court identification procedures that the Bexar County Sheriff's Department employed, the phone call from her friend who told her the names of the shooters, and her eventual identification of Amador.[6] See Trial Tr., Vol. III, pp. 6-75.

The two investigating officers, Detective Morales and Sergeant Marin, also testified at the hearing, describing their investigation, their interactions with Garza, Garza's initial hesitance to identify Amador, the hypnosis session, and the identification procedures that they employed, including the show up and the various photo arrays.[7] See id., Vol. IV, pp. 7-109, 166-254.

After the presentation of the evidence and the arguments,

---

[6] Garza's eventual testimony at trial largely mirrored the contents of her pretrial testimony, although a hearsay objection at trial prevented the jury from hearing that Garza had initially learned Amador's name from a friend.

[7] Likewise, the officers' testimony at trial was substantially similar to their pretrial testimony.

Amador again moved to suppress any in-court identification testimony from Garza, and, after considering the evidence presented at the hearing and watching a videotape recording of Garza's hypnosis session, the court denied this motion.

## 2. Trial, Conviction, and Sentencing

On June 30, 1995, a Bexar County grand jury returned an indictment against Amador on a charge of capital murder. Amador entered a plea of not guilty. The guilt-innocence phase of his jury trial began on July 5, 1995.

### a. Evidence Adduced at Trial

#### i. Amador's Oral Statement Identifying the Caliber of the Guns Used in the Crime

At the guilt-innocence phase of the trial, Sergeant Marin testified to Amador's statement during the prosecution's case-in-chief, and Amador's counsel objected once more, this time on hearsay grounds. The court overruled this objection and allowed Sergeant Marin to testify that Amador had identified the guns used in the shootings as .25 and .380 caliber weapons. Sergeant Marin also testified that the sheriff's department had publicly identified one of the weapons as a .380 caliber handgun in a press release dated January 4, 1994. Trial Tr., Vol. XIX, p. 189. The jury also heard testimony from Bexar County Sheriff's Department Detective Adrian Ramirez that on the morning of the shootings, officers had found a spent .25 caliber shell casing inside the abandoned taxicab. Id. Vol. XIX, p. 4. An officer

-11-

who was present at the crime scene, Daniel Sanchez, testified that he found a .380 caliber shell casing at the scene on the morning of the shootings.  Id. Vol. XVIII, p. 257.

### ii.  Garza's In-Court Identification of Amador

The prosecution also presented eyewitness testimony from Garza, who identified Amador in court.  In addition to describing the events leading up to the January 4, 1994, shooting, Garza testified that: (1) she had been "drinking all day" before Ayari picked her up the night of the shootings, and she had consumed approximately fourteen to fifteen beers and one wine cooler; (2) when Ayari stopped to pick up Amador and Rivas, she was still "intoxicated," "drunk," and "wasted," had been crying about a fight she had had with her boyfriend, and "wasn't really paying attention to anything"; (3) she was able to view Amador briefly that night when he walked in front of the cab's headlights to get money from Martinez's house and when he was in the back seat talking to her and Ayari; (4) on January 10, 1994, she gave a statement describing the suspect to aid the sheriff's department in creating a composite sketch and initially believed that the suspect was 6'1";[8] (5) she had never seen Amador before the night of the shootings; (6) on January 24, 1994, she was taken to the

---

[8]  Garza explained that, when she saw him at the sheriff's department, Amador looked different from the individual she had observed on the night of the shootings because he had shorter hair and was not as tall as she had remembered from her "slouched down" vantage point in the cab.

-12-

sheriff's department and instructed to view two people later identified as Amador and Martinez through holes cut into a piece of cardboard; (7) during this show up, she recognized Martinez as a former co-worker but "couldn't say" that she recognized Amador; (8) on that same day, before the show up, Detective Morales showed her a photo array of Hispanic males and a photo array of Hispanic females, but she could not identify any of them as suspects;[9] (9) on February 3, 1994, she submitted to a hypnosis session, no one during the session suggested to her the identity of her assailant, and afterwards she assisted in creating another composite sketch; (10) on March 30, 1994, Sergeant Marin showed her a photo array and she identified Amador from that array; and (11) she was never able to identify Rivas from a photo array or otherwise. Id. Vol. XVIII, pp. 93-252. A hearsay objection prevented Garza from testifying to the March 16, 1994, phone call from her friend who told her that he had heard that Amador and Rivas were involved in the shootings. Id. Vol. XVIII, p. 148.

Sergeant Marin and Detective Morales both testified regarding the procedures that they used that led to Garza's positive identification of Amador. Sergeant Marin told the jury that: (1) he picked up Amador and Martinez on January 24, 1994, after receiving a "Crime Stoppers" tip implicating them in the shooting of Ayari; (2) on that day, the officers conducted a show

---

[9] She testified that on that day she did, however, identify Martinez as someone she knew from work.

-13-

up at the homicide office where they had Garza look at Amador and Martinez through eye holes that were cut into a piece of cardboard; (3) using a cardboard apparatus of this sort was not a "normal" procedure; (4) the officers could have used a lineup or photo array identification procedure on that date but did not; (5) Garza had been unable to identify Amador at the show up or from any photo array until March 30, 1994; (6) to his personal knowledge, Amador's picture had not been included in a photo array before March 30, 1994, but (7) numerous officers were working on the case and it would not have been normal procedure to include information in his reports regarding the activities of other officers; (8) in April 1994, Rivas gave a statement to the sheriff's department;[10] and (9) on April 13, 1994, he took a statement from Amador.[11]  Id. Vol. XIX, pp. 131–233.

The defense called Detective Morales, who testified that: (1) he was the lead investigator in the case; (2) he had "numerous contacts" with Garza before she was able to identify Amador; and (3) there was nothing urgent that prompted the officers to do the show up with Garza on January 24, 1994, but rather it was just convenient.  Id. Vol. XX, pp. 173–202. Neither officer testified about Garza's hypnosis session or about

---

[10]  The contents of this statement were held to be inadmissible.

[11]  Portions of this statement were read into evidence.  See supra note 5.

-14-

the phone call that they received from Garza indicating that she had learned the names of the suspects from a friend.

Two other witnesses provided testimony that tended to implicate Amador in the shootings, Martinez and a witness named Esther Menchaca, who had driven by and seen Amador and Rivas walking on the median after they had abandoned the cab on the morning of January 4, 1994. Martinez testified that: (1) Amador was her boyfriend; (2) Amador awoke her in the early morning hours of January 4, 1994, by knocking on her window and asked her for money for a taxi ride; (3) approximately two weeks before January 4, 1994, Amador had told her that he "wanted to do something crazy involving a taxicab"; (4) sometime during the afternoon of January 4, 1994, Amador told her that he and his cousin had taken a taxi to Poteet and had shot someone; (5) Amador described the murder to her in great detail; and (6) Amador had written her a letter from prison pressuring her not to testify. Id. Vol. XIX, pp. 251-93; id. Vol. XX, pp. 12-46.

Menchaca testified that, early in the morning of January 4, 1994, she was on her way to work heading toward Poteet. At approximately 4:15 a.m. she observed an abandoned taxicab in the median of Highway 16 and saw a male and a female walking along side of the road. On May 3, 1994, she positively identified Amador from a photo array as the male she had seen walking down the road. Id. Vol. XIX, pp. 61-129.

-15-

### b. Conviction and Sentencing

On July 10, 1995, the jury returned its verdict, finding Amador guilty of capital murder. The punishment phase of the trial began that same day. On July 11, 1995, the jury sentenced Amador to death.

### 3. Direct Appeal to the Texas Court of Criminal Appeals

On July 9, 1996, Amador appealed his conviction and sentence to the Texas Court of Criminal Appeals ("TCCA"), alleging six points of error.[12]

### a. Amador's Oral Statement Identifying the Caliber of the Guns Used in the Crime

Amador's appellate counsel did not assign as error the trial court's ruling admitting into evidence Amador's statement identifying the caliber of the weapons used in the shooting.

### b. Garza's In-Court Identification of Amador

The points of error did include an allegation that the trial court erred by admitting into evidence Garza's in-court

---

[12] Amador's brief assigned the following as error: (1) the trial court's admission of Garza's in-court identification of Amador; (2) the trial court's instructions to the jury during the punishment phase of the trial regarding the capital sentencing "special issues" questions; (3) the trial court's failure to quash the indictment against Amador because it failed to allege the issues to be decided by the jury at the punishment phase; (4) the death penalty's violation of the Eighth Amendment; (5) the death penalty's violation of the United Nations Charter; and (6) the insufficiency of the evidence to support the jury's guilty verdict.

identification of Amador because the out-of-court show up and hypnosis identification procedures were unnecessary and suggestive in violation of Amador's due process rights. The TCCA did not reach the substance of this claim; instead, it held that Amador's counsel had failed to preserve the alleged error at trial. The court stated that after Amador's counsel filed his motion to suppress Garza's in-court identification testimony,

> [t]he trial judge agreed to view the videotape [of Garza's hypnosis session] and rule on the admissibility of Garza's in-court identification testimony afterwards. The judge told defense counsel he would contact his office and notify him of the ruling. However, [Amador's counsel] does not contend that such a ruling was ever made or direct us to any portion of the record where such a ruling can be found. Further, [Amador's counsel] made no objection to the admission of the evidence when it was introduced at the trial on the merits.
>
> . . . .
>
> [Amador's counsel] presents no justification, cause, or excuse for his failure to object to the admission of the evidence at the time of its introduction. . . . Therefore, presenting nothing for review, Amador's first point of error is overruled.

Amador v. Texas, No. 72,162, 5-6 (Tex. Crim. App. Apr. 23, 1997) (en banc) (unpublished). The trial court had in fact ruled on and denied the motion to suppress on May 23, 1995, as reflected in the trial court's docket entry from that date, located on page three of the first volume of the trial record. The TCCA also rejected the remaining five points of error and affirmed Amador's conviction and sentence. Id. Amador's counsel filed a petition for rehearing with the TCCA, but once again failed to provide the

-17-

court with the citation to the record evidencing the trial court's denial of Amador's motion to suppress. The TCCA denied the petition for rehearing on June 23, 1997, and the mandate issued that same day. Amador did not file a petition for writ of certiorari with the Supreme Court of the United States.

## B.   Post-Conviction Proceedings

### 1.   State Habeas Proceedings

Amador filed his petition for state habeas corpus relief in state district court for the 226th Judicial District of Bexar County on December 12, 1997. Amador alleged thirty-four total grounds for relief, including, inter alia, eight claims of ineffective assistance of counsel by his appellate counsel during his direct appeal, eleven claims of ineffective assistance of counsel at trial, and six claims of prosecutorial misconduct. The court held an evidentiary hearing on these claims from October 1-2 and 7-8, 1998. On February 14, 2001, the court adopted the state's proposed findings of fact and conclusions of law, recommending that habeas relief be denied on each of Amador's claims. Ex parte Amador, No. 94-CR-3643-W1 (Feb. 14, 2001) [hereinafter "State Habeas Order"]. The TCCA adopted all of the findings of fact and conclusions of law set forth in the state trial court's order and denied relief. Ex parte Amador, No. 48,848-10 (Tex. Ct. Crim. App. Sept. 12, 2001) (unpublished). The TCCA's denial of two of these claims is relevant to the

-18-

instant appeal.

### a. Amador's Oral Statement Identifying the Caliber of the Guns Used in the Crime

First, Amador argued that he was denied effective assistance of counsel on appeal because his attorney failed to assign as error the trial court's evidentiary ruling that Amador's statements concerning the caliber of guns used in the shootings were admissible. Trial Tr., Vol. XVIII, p. 174. Amador argued that the admission of this testimony under Article 38.22, section 3 of the Texas Code of Criminal Procedure was error because that provision applied only to statements containing facts that were unknown to law enforcement at the time the statement was made and later found to be accurate. See Dansby v. Texas, 931 S.W.2d 297, 298-99 (Tex. Crim. App. 1996) (holding that oral statements resulting from custodial interrogation were inadmissible because they merely confirmed information that law enforcement officers already knew). In the instant case, at the time Amador made the statement in question, the Bexar County Sheriff's Department was already aware of the caliber of the guns used in the shooting and therefore this statutory exception was inapplicable.

The TCCA rejected this argument for two reasons. First, it indicated that Amador's pretrial motion to suppress on Article 38.22 grounds was insufficient to preserve the error for direct appellate review. The court stated that, because Amador's counsel also objected to the admission of the statement at trial

on hearsay grounds, "any complaint raised on appeal would have been required to have raised that argument.  Put in other words, an argument based upon Art. 38.22 . . . was precluded by the hearsay objection lodged at trial."  State Habeas Order at 19.  In a footnote, the court added that it "is aware of the legal proposition that if a motion to suppress is heard and denied, no further objection is necessary to preserve the error.  However, in the instant [case] a further objection was made hence making that proposition inapplicable."  Id. at 19 n.5.  The court cited no relevant authority for this statement.  Second, the court stood by its initial ruling at trial that "the statements in question were admissible as an exception to the prohibition outlined by" Article 38.22.  According to the court, because the statement was admissible, Amador's counsel could not have been ineffective for failing to raise this issue on appeal because Amador suffered no prejudice as a result.  See Strickland v. Washington, 466 U.S. 668 (1984) (requiring a habeas petitioner to show both deficient performance and prejudice to prove ineffective assistance of counsel).

### b.   Garza's In-Court Identification of Amador

Second, Amador argued that he received ineffective assistance of counsel on direct appeal because his attorney failed properly to allege that the state trial court erred in admitting Garza's in-court identification testimony that was the

result of unnecessary and suggestive identification procedures in violation of his due process rights. Specifically, Amador faulted his appellate counsel for failing to direct the TCCA to the docket notation indicating that this issue had indeed been preserved for review.[13] See State Habeas R., Vol. I, pp. 11-12. The state habeas court, apparently believing that Amador was arguing that his counsel had not raised the issue of Garza's identification testimony at all on appeal, rejected Amador's claim for two reasons: (1) Amador's counsel had in fact raised the issue of the admissibility of the identification testimony on appeal and the TCCA held that the issue was not properly preserved for review; and (2) the claim "erroneously presupposes that the testimony of Garza was inadmissible as a violation [of Amador's] right to due process of law," and the admission of the evidence did not prejudice Amador because, even if pretrial identification techniques had been unnecessary and suggestive, the in-court identification testimony was still admissible because "the totality of the circumstances reveal no substantial

---

[13] At the state habeas corpus evidentiary hearing, Amador's appellate counsel testified that, at the time of the direct appeal, he believed the state's argument that this error had not been preserved for review to be incorrect. He also testified that, despite this belief, he made no effort to direct the TCCA to the location in the docket where the trial court formally overruled Amador's motion to suppress the in-court identification testimony; he did not search the record for this information; and he did not file a motion for rehearing identifying the docket entry in question. State Habeas Evidentiary Hearing Tr., Vol. II, 10-35.

-21-

likelihood of misidentification."

## 2. Federal Habeas Proceedings

Amador filed his 28 U.S.C. § 2254 petition for federal habeas corpus relief in the United States District Court for the Western District of Texas on May 24, 2002, and filed an amended and supplemental habeas petition on May 2, 2003. He alleged sixty total claims for relief. On September 3, 2003, the state filed a motion for summary judgment. The district court ultimately granted the state's motion for summary judgment, denying all of Amador's claims for relief. Amador v. Dretke, No. SA-02-CA-230-XR (Apr. 11, 2005) [hereinafter "Dist. Ct. Order"]. However, the district court granted a certificate of appealability ("COA") on two of those claims: (1) that Amador received ineffective assistance of counsel on appeal because his counsel failed to assign as error the trial court's admission of his statement identifying the caliber of guns used in the shooting; and (2) that Amador received ineffective assistance of counsel on appeal because his counsel failed properly to present a challenge to the state trial court's denial of Amador's pretrial motion to suppress the in-court identification testimony of Garza.

### a. Amador's Oral Statement Identifying the Caliber of the Guns Used in the Crime

Citing reasons different from those cited in the TCCA's opinion, the district court denied Amador's claim regarding his

statement identifying the caliber of guns.  As a preliminary matter, the district court noted that when the TCCA denied this point of error, it essentially held that Amador's counsel had procedurally defaulted on this claim by failing to re-urge his Article 38.22 objection at trial and asserting only a hearsay objection instead.  Further, the court noted that the state habeas court's reasoning on this point was likely erroneous because the district court's "independent research has disclosed no other instances other than [Amador's] case in which a Texas appellate court has applied such a rule of procedural default to foreclose merits review of an Article 38.22 claim following a trial court's formal denial of a pretrial motion to suppress." Dist. Ct. Order at 127.  Therefore, the district court proceeded to review the merits of Amador's claim pursuant to Ford v. Georgia, 498 U.S. 411, 423-24 (1991) (holding that application of state procedural default rules bars federal habeas merits review of a claim only when the state procedural default rule is firmly in place and regularly followed).

Reviewing the merits of the claim, the district court noted that, under its review of the relevant Texas case law, Amador's statement was likely inadmissible under Article 38.22 of the Texas Code of Criminal Procedure.  However, applying the Texas harmless-error principles that governed at the time of Amador's direct appeal, the court held that, even if Amador's statement had been inadmissible, any error in admitting the statement would

-23-

have been harmless and therefore Amador could not prove the prejudice necessary to establish ineffective assistance of counsel under Strickland, 466 U.S. 668.

### b. Garza's In-Court Identification of Amador

The district court also denied Amador's claim regarding Garza's in-court identification testimony, holding that Amador failed to show that Garza's identification testimony was inadmissible and therefore his counsel's failure to properly preserve this point of error did not constitute prejudice under Strickland. First, with regard to the hypnosis procedure, the district court stated that Amador "never alleged any specific facts, nor presented any evidence, before the state habeas court establishing that any of the procedures employed . . . were unduly suggestive or otherwise tainted Esther Garza's subsequent in-court identification of [Amador] as one of her and Ayari's assailants." Dist. Ct. Order at 83.

Second, the court determined that, even if the show up by its very nature had been suggestive, Garza's identification of Amador had nonetheless been reliable under Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The district court accordingly rejected Amador's claim, finding that the TCCA reasonably applied the law to find that Garza's identification was admissible and there was no prejudice under Strickland.

On May 10, 2005, Amador filed a timely notice of appeal with

this court.

## II. STANDARD OF REVIEW

This habeas proceeding is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") because Amador filed his § 2254 habeas petition on December 12, 1997, after AEDPA's effective date of April 24, 1996. See Fisher v. Johnson, 174 F.3d 710, 711 (5th Cir. 1999). This court has jurisdiction to resolve the merits of Amador's habeas petition because, as stated above, the district court granted him a COA. See Dist. Ct. Order at 123-28; see also 28 U.S.C. § 2253(c)(1); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (explaining that a COA is a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners").

We review de novo the district court's grant of summary judgment denying a state petitioner's request for habeas relief. Ogan v. Cockrell, 297 F.3d 349, 355-56 (5th Cir. 2002); Fisher v. Texas, 169 F.3d 295, 299 (5th Cir. 1999). We review the district court's conclusions of law de novo and its findings of fact, if any, for clear error. Collier v. Cockrell, 300 F.3d 577, 582 (5th Cir. 2002). Moreover, "'a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.'" Pondexter v. Dretke, 346 F.3d 142, 148 (5th Cir.

-25-

2003) (quoting Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)).

Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 402-13 (2000). A state court's decision is "contrary to" clearly established federal law if (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts. Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003). A state court's application of clearly established federal law is "unreasonable" within the meaning of AEDPA when the state court identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an objectively unreasonable manner. Wiggins v. Smith, 539 U.S. 510, 520 (2003).

A writ of habeas corpus may also issue if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under AEDPA, state-court factual findings are "presumed to be correct" unless the habeas petitioner rebuts the presumption through "clear and convincing evidence." Id. § 2254(e)(1); see Miller v. Johnson, 200 F.3d 274, 281 (2000).

## III.  DISCUSSION

Both of Amador's ineffective assistance of appellate counsel claims are governed by the test set forth in Strickland, 466 U.S. at 687-88. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner first must show that counsel's performance was deficient. Id. Counsel's performance is deficient if it falls below an objective standard of reasonableness. Id. A court's review of counsel's conduct is deferential, presuming that "counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. While counsel need not raise every nonfrivolous ground available on appeal, "a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. . . . Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." United States

-27-

v. Williamson, 183 F.3d 458, 462-63 (5th Cir. 1999).

Once the petitioner establishes deficient performance, he then must show that counsel's objectively unreasonable performance prejudiced the petitioner. Strickland, 466 U.S. at 688. A petitioner suffers prejudice if, but for the deficient performance, the outcome of the trial--or, in this case, the appeal--would have been different. Id. Although Strickland itself involved ineffective assistance of trial counsel, the Strickland analysis applies equally to claims of ineffective assistance of appellate counsel. See Mayabb v. Johnson, 168 F.3d 863, 869 (5th Cir. 1999) (applying Strickland to an ineffective assistance of appellate counsel claim and noting that "[w]hen we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error predicated on the same issue"); see also Smith v. Robbins, 528 U.S. 259, 285 (2000) (noting that Strickland is the appropriate standard to apply to claims of ineffective counsel on appeal).

## A. Amador's Oral Statement Identifying the Caliber of Guns Used in the Shootings

Applying Strickland, we first must determine whether the failure of Amador's appellate counsel to assign as error the court's admission of Amador's statement identifying the caliber of the guns constituted deficient performance.[14] On its face,

_____

[14] Like the district court, we decline to treat this claim as procedurally defaulted in light of the TCCA's holding that "an argument based upon Art. 38.22 . . . was precluded by the hearsay

-28-

the applicable statute mandates that an unrecorded, inculpatory statement made by the accused that is the product of a custodial interrogation is admissible if the statement "contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed." TEX. CRIM. PROC. CODE ANN. art. 38.22(3)(c). Citing a number of TCCA cases interpreting Article 38.22, section 3, Amador contends that the TCCA erred when it held that the statement was admissible because this provision applies only to statements that provide facts that were unknown to the police at the time the statement was made and were later found to be true. See Romero v. Texas, 800 S.W.2d 539, 545 (Tex. Crim. App. 1990) ("The reliability demanded by Sec. 3 is founded upon [the] premise [] that the oral confession contain facts that lead to the discovery of items or information previously unknown to the police."); see also Dansby, 931 S.W.2d at 298-99; Port v. Texas, 791 S.W.2d 103, 108 (Tex. Crim. App.

---

objection lodged at trial" despite Amador's pretrial objection to the admission of the statement on Article 38.22 grounds. State Habeas Order at 19. We similarly conclude that even if this ruling were properly characterized as one of procedural default and review would otherwise be barred on independent and adequate state grounds, it does not meet the criteria for procedural default because such a rule is neither firmly in place nor regularly followed in Texas state courts. See Ford, 498 U.S. at 423-24. The state points to no cases supporting the existence of such a rule, and we have found none. We therefore address the TCCA's alternative holding on the merits.

-29-

1990).  Amador argues that, contrary to the finding made by the TCCA in this case, his statement was inadmissible and did not fall under the Article 38.22, section 3 exception because, at the time he made the statement on April 14, 1994, the police already knew the caliber of the guns used in the shootings. Specifically, Amador correctly notes that the record reflects that, on January 4, 1994, a .25 caliber bullet was removed from Garza's nasal cavity the day of the shootings, the police found a .25 caliber shell casing in the taxicab and a .380 caliber shell casing at the crime scene, and the Bexar County Sheriff's Department issued a press release stating that a .380 caliber gun was used in the crime.

Because we hold that the TCCA's determination that Amador failed to establish the prejudice prong of the Strickland test was not an unreasonable application of clearly established law, we pretermit a decision on the deficient performance prong of Strickland and assume without deciding that Amador has shown deficient performance.  See Strickland, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Amador's Strickland claim fails because he cannot establish that, but for this deficient

-30-

performance, the outcome of his appeal would have been different. The prejudice inquiry in this case turns on a question of Texas state law: whether the statement was in fact admissible at trial under Article 38.22, section 3 of the Texas Code of Criminal Procedure. To be sure, some Texas courts have applied a gloss on Article 38.22, section 3, holding that provision applicable only to statements containing facts that were unknown to the police at the time and later found to be true; however, every Texas state court to have addressed the issue in the instant case--from the trial court to the state habeas court to the TCCA--has held that the statement was in fact admissible under the broad language of this provision. See, e.g., State Habeas Order at 19 (holding that "the statements in question were admissible as an exception to the prohibition outlined by" Article 38.22). Although other Texas courts have interpreted Article 38.22, section 3 differently than the state habeas court did in this case, "in our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law." Young v. Dretke, 356 F.3d 616, 628 (5th Cir. 2004) (declining to review the state habeas court's determination of the validity of a Texas statute under the Texas constitution in the context of a Strickland claim); see also Bradshaw v. Richey, --- U.S. ----, 126 S. Ct. 602, 604 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); Estelle v. McGuire, 502 U.S. 62, 67-

-31-

68 (1991) ("[I]t is not the province of a federal habeas corpus court to reexamine state-court determinations on state-law questions."); Gibbs v. Johnson, 154 F.3d 253, 259 (5th Cir. 1998) ("As a federal court in a habeas review of a state court conviction, we cannot review state rulings on state law."). Therefore, because the state habeas court held that Amador's statement identifying the caliber of the guns was admissible under Texas law, the result of Amador's appeal would not have been different had his appellate counsel raised this claim. Accordingly, the TCCA's determination that Amador did not receive ineffective assistance of appellate counsel under Strickland was not an unreasonable application of federal law.

**B.    Garza's In-Court Identification of Amador**

Amador also argues that he received ineffective assistance of counsel when his appellate counsel failed to identify the docket entry reflecting that the trial court had entered an adverse ruling on his objection to the admission of Garza's in-court identification testimony, thereby preserving the objection for appeal.

Under the first prong of the Strickland test, the conduct of Amador's appellate counsel was deficient because it fell below an objective standard of reasonableness. During the state habeas evidentiary hearing, Amador's appellate counsel testified to his own conduct during the direct appeal. By his own admission,

-32-

appellate counsel knew that the TCCA's holding that the alleged error had not been preserved was incorrect; despite this knowledge, counsel did not respond to the assertion in the state's appellate brief that the trial court had not ruled on the objection, did not attempt to locate the docket entry reflecting the trial court's adverse ruling, and did not attempt to correct the misconception in the subsequent petition for rehearing. State Habeas Evidentiary Hearing Tr., Vol. II, 10–35. Moreover, Amador's counsel admitted that his failure to do these things served "no strategic purpose." Id. at 21; see Busby v. Dretke, 359 F.3d 708, 715 (2004) ("Strategic decisions . . . can rarely constitute ineffective assistance of counsel, so long as they are based on reasonable investigations of the applicable law and facts.") (citing Strickland, 466 U.S. at 691) (emphasis added); Moore v. Johnson, 194 F.3d 586, 604 (5th Cir. 1999) ("The Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all."). Given that counsel knew in advance that the state would argue that the court had not entered an adverse ruling on the objection, that counsel's failure to investigate was a result of negligence rather than trial strategy, and that the information to rebut the state's argument was easily accessible through a copy of the trial docket, counsel's conduct fell below an objective standard

-33-

of reasonableness.  See Rompilla v. Beard, 545 U.S. 374 (2005) (holding that counsel's performance fell below an objective standard of reasonableness when counsel failed to examine readily available files containing mitigating evidence despite notice that the state intended to use information from those files in prosecuting counsel's client).

However, Amador's ineffective assistance of counsel claim fails because he cannot show that he suffered prejudice from his counsel's deficient conduct.  Relevant to whether Amador suffered prejudice is whether Garza's in-court identification testimony was inadmissible because it was tainted by out-of-court identification procedures that violated Amador's due process rights under the Fifth and Fourteenth Amendments.  Out-of-court identification procedures violate a defendant's due process rights if those procedures are (1) unnecessary and suggestive, and (2) unreliable.  See Brathwaite, 432 U.S. at 114 (enunciating the two-prong test to determine the admissibility of in-court identification testimony based on out-of-court identification procedures); United States v. Atkins, 698 F.2d 711, 713 (5th Cir. 1983) (applying the two-prong Brathwaite test to possibly suggestive identification procedures).

In this case, the show up was unnecessary and suggestive under the first prong of the Brathwaite test.  Requiring Garza to view Amador through the cardboard apparatus while Amador was standing in the homicide office of the Bexar County Sheriff's

-34-

Department was suggestive because the procedure encouraged Garza to identify the person she was viewing as the suspect. Indeed, the Supreme Court has acknowledged that show ups such as this one are inherently suggestive procedures, noting, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302 (1967); see also United States v. Wade, 388 U.S. 218, 228-30 (1967) (noting that show ups are inherently suggestive); cf. United States v. Guidry, 406 F.3d 314, 319 (5th Cir. 2005) (holding that the show up procedure was not suggestive where the show up was not one-on-one, but rather was the equivalent of a lineup procedure).

Moreover, although show ups often will not violate a defendant's due process rights when they are performed out of necessity or urgency, Detective Morales testified that there was no exigency or urgent need for performing the January 24, 1994, show up at the sheriff's department and that they could have used a lineup procedure but chose not to. Trial Tr. Vol. XX, p. 194; cf. Stovall, 388 U.S. at 302 (holding that a show up did not violate the defendant's due process rights when the only witness who could identify or exonerate him was in the hospital near death); Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997) (holding that a show up did not violate defendant's due process rights when the "exigency of the circumstances" made the

procedure necessary).[15]

However, the TCCA did not unreasonably apply clearly established federal law when it held that the identification testimony at issue in this case was nonetheless admissible because it was reliable under the second prong of the Brathwaite test. See Brathwaite, 432 U.S. at 114 ("[R]eliability is the linchpin in determining the admissibility of identification testimony"). Under the reliability prong, even if an identification procedure is unnecessary and suggestive in

---

[15] Amador contends that the hypnosis session that Garza underwent in addition to the show up was unnecessary and inherently suggestive. The Supreme Court has acknowledged the suggestive nature of hypnosis, observing that

> [t]he most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections. . . . Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

Rock v. Arkansas, 483 U.S. 44, 59-60 (1987). While there is no evidence in this case that the hypnosis procedure alone was explicitly suggestive, the very fact that it happened shortly after another inherently suggestive procedure (i.e., the show up) is relevant to the overall suggestiveness of the identification procedures under the totality of the circumstances. See Stovall, 388 U.S. at 302 (analyzing the totality of the circumstances to determine if an identification procedure violated due process). Nevertheless, there is no evidence in this case that the hypnosis procedure alone was explicitly suggestive or that it became so when it occurred shortly after the show up.

violation of a defendant's due process rights, the resulting testimony is admissible if the identification is nonetheless reliable in light of the totality of the circumstances; i.e., if it poses "no substantial likelihood of irreparable misidentification." Id. at 116; Stovall, 388 U.S. at 302 ("[A] claimed violation of due process of law depends on the totality of the circumstances surrounding it."); see also Neil v. Biggers, 409 U.S. 188, 198 (1972). The Brathwaite Court articulated five factors that courts should apply in evaluating the reliability of an identification procedure: (1) the witness's opportunity to view the suspect; (2) the witness's degree of attention; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty; and (5) the time between the crime and the trial confrontation. Brathwaite, 432 U.S. at 114-16; see also Neil, 409 U.S. at 198; United States v. Hefferon, 314 F.3d 211, 217-18 (5th Cir. 2002) (applying the Brathwaite factors to determine that the show up had sufficient indicia of reliability for the witness's identification testimony to be admissible at trial).

Garza testified at both the pretrial hearing and at trial before the jury that she had a sufficient view of Amador's face when Amador crossed in front of the taxicab's headlights on his way to retrieve money from Martinez's house and when Amador was inside the cab talking to her and Ayari. Trial Tr., Vol. III, pp. 11-15, 60-61; id. at Vol. XVIII, pp. 109-115, 193, 214, 218.

-37-

Garza emphasized that she got a "good look" at Amador's face during Amador's walk back to the taxicab from Martinez's house. Id. at Vol. III, p. 46; id. at Vol. XVIII, p. 214. Although her initial estimation of Amador's height was incorrect, Garza explained that she was slouched down during the car ride and thus had overestimated Amador's height from that angle. Other than this height discrepancy, Garza's description of the suspect remained certain and unchanged from January 10, 1994, through the end of the trial; indeed, Garza testified at trial that Amador had changed his appearance dramatically by shaving his head between the time of the shootings and the trial. Moreover, despite the suggestiveness of the January 24, 1994, show up, Garza refused to identify Amador on that day based on the height discrepancy and Amador's shaved head, which was different from the full head of dark hair that Amador had on the night of the shootings. Id. at Vol. III, pp. 24-26, 60-61; id. at Vol. XVIII, pp. 145, 154, 229, 232. In fact, Garza explained that she was reluctant to identify anyone until she was confident in her identification; she explained that when she finally identified Amador as the male passenger in the cab that night--two months after the hypnosis session and three months after the shootings-- she "had all that time to think about it and [she] just pictured him and [she] just [knew] . . . it's him." Id. at Vol. XVIII, p. 248.

As in Brathwaite,

-38-

> we cannot say that under all the circumstances of this case there is a very substantial likelihood of misidentification. . . . Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and good judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Brathwaite, 432 U.S. at 116. In this case, the jury heard extensive testimony and cross examination regarding the identification procedures and Garza's initial reluctance to identify Amador, not only from Garza but also from Sergeant Marin and Detective Morales. Given that Garza's identification of Amador was ultimately reliable under the Brathwaite factors, and because the jury was able to make an informed decision regarding the reliability of that identification based on the copious evidence presented at trial, the TCCA's application of Strickland was not unreasonable because no prejudice ensued despite the suggestiveness of the identification procedures.

Moreover, even if the identification testimony should have been excluded under Brathwaite because the identification was ultimately unreliable, there still would not have been prejudice under Strickland given the weight of the other inculpatory evidence offered at trial. Even without Garza's identification of Amador as the male passenger in the cab on the night of the shootings, the jury heard Amador's voluntary statement describing what he "would have" done had he been involved in the shootings

-39-

and concluding that "[i]f all this stuff about the murder is true and they can prove it in court, then I will take my death sentence." The jury also heard testimony from Martinez, who described Amador's confession to her detailing what happened on the night of the shootings, mentioned Amador's prior statement that he wanted to do something "crazy involving a taxicab," and testified that Amador had written her a letter from prison warning her not to testify. The jury also heard about the Crime Stoppers tip that led to Amador's arrest and Amador's accurate identification of the caliber of the guns used in the shooting once in custody. Moreover, witness Esther Menchaca testified, placing Amador and Rivas at the scene of the abandoned taxicab shortly after the shootings occurred in the early morning of January 4, 1994, and explaining that she had previously identified Amador from a photo array.

Given the great weight of additional evidence against Amador, we cannot say that there is a reasonable probability that, but for the admission of the identification evidence, the outcome of the trial would have been different. See Strickland, 466 U.S. at 695. Accordingly, the TCCA did not unreasonably apply clearly established federal law when it held that counsel's failure to argue this point adequately on appeal does not rise to the level of constitutional error. See Mayabb, 168 F.3d at 869 ("When we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error

-40-

predicated on the same issue.").

## IV. CONCLUSION

For the foregoing reasons, we hold that the TCCA did not unreasonably apply clearly established federal law as announced by the Supreme Court. We therefore AFFIRM the district court's denial of habeas relief.