DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ZAVION ALAHAD,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-3438

[September 1, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Tim Bailey, Judge; L.T. Case No. 17-273 CF10A.

Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Deborah Koenig, Assistant Attorney General, West Palm Beach, for appellee.

CIKLIN, J.

Zavion Alahad timely appeals convictions of second-degree murder and attempted robbery with a firearm, and raises numerous issues. We affirm, but we write to address his argument that the trial court erred by denying his motion to suppress an eyewitness's identifications because, he alleges, the law enforcement show-up[1] was unnecessarily suggestive and gave rise to a substantial likelihood of irreparable misidentification. Our affirmance on the issue is based on the application of the abuse of discretion standard of review.

## I.  *Factual Background*

The crimes were committed outside of a convenience store in Fort Lauderdale around 12:20 p.m. in December 2016.  The eyewitness drove

---

[1] In a show-up, "the police take a witness, shortly after the commission of an observed crime, to where the police are detaining the suspect, in order to give them an opportunity to make an identification." *Walker v. State*, 776 So. 2d 943, 945 (Fla. 4th DCA 2000), *cause dismissed,* 790 So. 2d 1111 (Fla. 2001).

her boyfriend – the victim – to the convenience store. According to the eyewitness, who was waiting in the car, the victim exited the store and was approached by the defendant, who grabbed the victim and demanded his money. The men were ten to fifteen feet away from the car when the eyewitness first saw them. The victim attempted to open the passenger car door but could not get in because they were tussling, and they struggled around to the hood of the car. The victim fell to the ground on his back, facing the suspect, and the suspect pulled out a gun and fired a few times at the victim on the ground, killing him. Immediately upon the shooting, the assailant ran.

The eyewitness described the shooter to police as a black male, approximately 5'10", 125 pounds, skinny, in his twenties or younger, and as wearing a gray sweatshirt. She explained to law enforcement that she "got a good look at" the shooter's face. She told an officer that she would be able to fully identify the shooter if she saw him again. The eyewitness also showed law enforcement the area where she saw him run. The defendant was a black male, 5'9", seventeen years old, and weighed 150 pounds at the time of the shooting.

A woman who lived nearby called 911 later that afternoon, identified the defendant by name, and stated that the defendant ran through her yard with a firearm in hand and was in a nearby apartment with a white Christmas tree in front of the door.

Law enforcement officers went to the identified apartment and the defendant was there—along with several other men. One of the men, Nixon, also matched the description provided by the eyewitness: he was twenty-five years old, 5'8" or 5'9", and very thin but muscular. Although not initially described by the eyewitness, the two men each had facial markings: Nixon had facial tattoos, including two teardrops on the right side of his face, and the defendant had a teardrop-shaped birthmark or scar on the right side of his face.

Law enforcement reached out to the eyewitness the same afternoon, about three hours after the shooting, and told her that they were going to show her "a guy from [her] description" and that they wanted her to let them know if he was the shooter. When the officers and the eyewitness arrived, she was shown only the defendant. From approximately thirty feet away, she identified the defendant as the shooter. She told Detective Almanzar that she was "pretty positive" it was the defendant, but when he asked if she was one hundred percent sure, she said yes.

2

Law enforcement officers did not show the eyewitness anyone else at the show-up "because at that point [they] had already received information identifying [the defendant] as running through a yard immediately after the shooting wearing the gray hooded sweatshirt as described and carrying a gun." However, the similarity in appearance between the defendant and Nixon prompted one officer to order both men's hands swabbed for gunpowder residue "[s]o that nobody tried to say [Nixon] did it."

Prior to trial, the defendant moved to suppress the eyewitness's out-of-court and in-court identification of him, contending they were the result of an unnecessarily suggestive show-up that gave rise to a substantial likelihood of irreparable misidentification. At the hearing on the motion to suppress, the eyewitness testified regarding her opportunity to look at the shooter during the crime. When the shooter first approached the victim near her passenger door, the eyewitness "couldn't really see the face too much then but I saw clothes until they turned around the car." When he ran up to the victim, the shooter had the hoodie covering his hair, and she initially only saw him from the side. She saw the shooter's face when the victim fell to the ground. She saw his whole face "straight"; he was facing the untinted front window of her car. She explained that, when the shooter fired the gun, "I sat back in the seat and observed what was -- what should be my next move. I was scared to -- it happened so fast that my first thought really was to pay attention to who was doing this to him and I paid attention to the face." She estimated that she saw his face for three or four minutes, "[p]robably more," but she was not sure. It was "[n]ot just a piece, not just the side," but "the whole face," and she "concentrated on it."

The eyewitness testified that, prior to the show-up, the law enforcement officers told her that they found someone who matched the description that she gave, and she initially denied that the officers told her that they found him in the area where she said he went. However, after being confronted with her prior deposition testimony, she stated that the officers told her that they found him in the area to which she said the shooter ran. One of the detectives involved in the show-up, Detective Novak, testified that he may have told her that he had a person who matched her description, but he did not tell her that the suspect was in an area where she had seen the shooter run to or give her any other information about the defendant. Detective Almanzar testified that he told the eyewitness that he had someone detained who matched the description and wanted her to see if he was the shooter, but he did not recall telling her that he was found in the area that she said the person ran to.

3

The officers took the eyewitness to the apartment building where she had seen the shooter run. The defendant was standing outside of the building with an officer on each side of him, but the eyewitness could not remember if he was wearing handcuffs. According to Detective Almanzar's testimony, there was no hesitation in the eyewitness's voice when she identified the defendant as the shooter. He asked her what it was about this person that reminded her of the person she saw earlier, and she described what she thought was a tear-shaped tattoo under his right eye, a detail she confirmed in her testimony at the suppression hearing.

The trial court ruled that the identifications were admissible. It acknowledged the eyewitness's memory had some gaps and she had not mentioned the tattoo until the show-up. The trial court further acknowledged that show-ups are always suggestive. But it reasoned a substantial likelihood of misidentification did not exist because the eyewitness had a good opportunity to view the shooter, as the crime was committed in broad daylight and the shooter was near the hood of her car, only three hours elapsed between the shooting and the show-up, and the eyewitness exhibited a high level of certainty, stating she was one hundred percent positive it was the defendant.

We now review the trial court's determination that the identifications were admissible.

## II. Standard of Review

> In reviewing a trial court's ruling on a motion to suppress, appellate courts must accord a presumption of correctness to the trial court's determination of the historical facts, but must independently review mixed questions of law and fact that ultimately determine the constitutional issues arising in the context of the Fourth Amendment.

*Walton v. State*, 208 So. 3d 60, 65 (Fla. 2016) (citation omitted).

"The decision to admit a pre-trial identification is within the sound discretion of the trial court and the decision should be overturned only upon a showing of abuse of discretion." *Walker v. State,* 776 So. 2d 943, 945 (Fla. 4th DCA 2000). Under the abuse of discretion standard of review, the trial court will be affirmed unless "the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980) (quoting *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 967 (9th Cir. 1942)).

4

"If reasonable [persons] could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.* (quoting *Delno,* 124 F.2d at 967).

## III.    Analysis

"It is well settled that a show-up . . . is inherently suggestive because a witness is presented with only one suspect for identification." *Adderly v. State,* 44 So. 3d 167, 169 (Fla. 4th DCA 2010). "The primary evil to be avoided in the introduction of an out-of-court identification is a very substantial likelihood of misidentification. An impermissibly suggestive identification procedure is one that creates the danger of misidentification so great that it violates due process." *Walton,* 208 So. 3d at 65.

The Florida Supreme Court "has adopted a two-part test to determine whether an out-of-court identification may be admitted: First, whether police used an unnecessarily suggestive procedure to obtain an out-of-court identification, and, second, if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Davis v. State,* 207 So. 3d 177, 207 (Fla. 2016) (quoting *Green v. State,* 641 So. 2d 391, 394 (Fla. 1994)). "[T]he identification will not be valid if there was a substantial likelihood of irreparable misidentification based upon the totality of circumstances." *Walker,* 776 So. 2d at 945.

With respect to the first part of the test, "'show-up' procedures are inherently suggestive because the witness is presented with only one suspect for identification." *Id.* However, the identification may be valid if it "is based solely upon the witness' independent recollection of the suspect without being influenced by the suggestiveness of the procedure." *Id.* "Show-ups are not *unnecessarily* suggestive unless the police aggravate the suggestiveness of the confrontation." *State v. Jackson,* 744 So. 2d 545, 548 (Fla. 5th DCA 1999) (emphasis in original).

In the case at bar, the defendant argues that the procedures utilized in his show-up were unnecessarily suggestive because (1) the defendant was in handcuffs and flanked by two officers, (2) the police told the eyewitness that he matched her description and that he was found in the area to which she saw him flee, and (3) although others were found in the apartment, at least one of whom matched the description the eyewitness provided, the eyewitness was shown a single person.

The circumstances of this show-up suggest that the trial court's determination was likely a close call. Due to the abuse of discretion standard of review, however, we are compelled to affirm.

On the defendant's first argument, the presence of officers or handcuffs, standing alone, does not render a show-up impermissibly suggestive. *See, e.g., Jackson*, 744 So. 2d at 548 (rejecting argument that police conduct aggravated suggestiveness of confrontation because Jackson was handcuffed at a police car when viewed).

On the defendant's second argument, a show-up procedure may give rise to a substantial likelihood of misidentification where the police describe to the witness that he or she will be viewing someone who matches the description provided. *See Anderson v. State*, 946 So. 2d 579, 582 (Fla. 4th DCA 2006). However, the vagueness of Detectives Almanzar's and Novak's indications that the eyewitness would see someone who "matches the description" renders this case distinguishable from those cases relied upon by the defendant in which Florida courts have reversed due to a substantial likelihood of misidentification due to police conduct. *See, e.g., id.* (holding that show-up procedures were unnecessarily suggestive where witness was robbed by a man holding a screwdriver and "before arriving at the show-up, the police told [the witness] that they were detaining someone who had a screwdriver and was wearing clothing fitting the description given by" the witness); *see also Smith v. State*, 362 So. 2d 417, 418-19 (Fla. 1st DCA 1978) (reversing where most photographs in line-up did not match witness's description, Smith's photograph was the only one that bore the caption, "Up to fifteen years state prison," and during witness's second photo line-up, deputy told witness he had recently taken a suspect into custody who fit "the description [she] gave him and that the guy had been in one of the pictures the night before and [she] had almost picked it up, but [she] wasn't sure"). *Anderson* and *Smith* involved far more egregious statements and conduct by police than that at issue here. In light of these differences, we decline to hold that the statement at issue here that the defendant "matche[d] the description" was an unnecessarily suggestive procedure used to obtain the identification and that no reasonable judge would rule otherwise.

The defendant's third argument spotlights the most troubling fact: the presence of Nixon, who also matched the eyewitness's description, in the apartment with the defendant at the time he was apprehended. Nixon was not presented to the eyewitness in the show-up. By denying the motion to suppress, the trial court implicitly determined that the police's failure to present Nixon in the show-up was not something that the police did to aggravate the show-up's suggestiveness.

6

Reasonable minds could differ as to whether the failure to present Nixon rendered the show-up unduly suggestive. Under these facts and in light of Florida case law,[2] we cannot conclude that the trial court's determination was one that no reasonable judge would make. A neighbor identified the defendant by name, so law enforcement had a legitimate basis to zero in on the defendant for a show-up. In other words, unlike in other cases, here nothing indicated intentional misconduct or incompetence on the part of law enforcement. Thus, the trial court reasonably concluded that law enforcement's choice to present the named suspect over someone who resembled him was not police conduct that aggravated the show-up's suggestiveness.[3]

Applying the abuse of discretion standard of review, we must affirm the trial court's determination that the show-up was not unnecessarily suggestive. Consequently, we do not reach the analysis's second step, whether the procedure's suggestiveness gave rise to a substantial likelihood of irreparable misidentification.

We affirm on the remaining arguments raised without further discussion.

*Affirmed.*

WARNER and GROSS, JJ., concur.

---

[2] Unlike Florida precedent, some other jurisdictions incorporate the exigency of the situation and/or whether less suggestive identification procedures could have been utilized in their analysis of whether a show-up is unnecessarily suggestive. *See, e.g.*, *Amador v. Quarterman*, 458 F.3d 397, 413-14 (5th Cir. 2006) (holding show-up was unnecessary and suggestive where witness viewed defendant through piece of cardboard with holes while he was standing in sheriff's homicide office because procedure encouraged witness to identify suspect she was viewing and there was no exigency that would have precluded a lineup); *People v. Knox*, 96 N.Y.S.3d 811, 812 (2019) (explaining that show-ups "are not presumptively infirm . . . but must be shown to be reasonable under the circumstances—i.e., justified by exigency or temporal and spatial proximity [to the crime]" (citations and quotation marks omitted) (second alteration in original)).

[3] Instead, Nixon's presence would seem to bear on the consideration in the analysis's second step: whether, in the totality of the circumstances, "the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Davis*, 207 So. 3d at 207. "However, where the procedure used to obtain the out-of-court identification was not unnecessarily suggestive, the likelihood of irreparable misidentification need not be explored." *Id.*

*　　　*　　　*

*Not final until disposition of timely filed motion for rehearing.*